# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| DON GRIMES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12-CV-1229-JAR |
| ) | |
| FOX & HOUND RESTAURANT GROUP, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff brings this action asserting claims of retaliation and interference arising under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*. Plaintiff asserts claims against his prior employer, Defendant Fox & Hound Restaurant Group ("Fox & Hound"), for alleged interference with his FMLA rights and retaliation for asserting rights under the FMLA. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 42). Plaintiff filed a Motion for Hearing (Doc. 49), requesting a hearing on the summary judgment motion. Because the Court finds that a hearing on the summary judgment motion would not assist the Court, the motion for hearing is denied. The summary judgment motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court grants Fox & Hound's motion for summary judgment.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates "that there is no

genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine issue of

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[11]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[12]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[13]

## II.  UNCONTROVERTED FACTS

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

---

[8]*Anderson,* 477 U.S. at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

[11]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[12]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[13]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Fox & Hound is an eating and drinking establishment that caters to customers in a sports-oriented setting. Fox & Hound hired Plaintiff in 2010 to fulfill a General Manager opening at the Wichita Fox & Hound location. Plaintiff began his employment with Fox & Hound on March 10, 2010, as a General Manager in Training. After completing the General Manager in Training program, Plaintiff worked as the Managing Partner for the Wichita, Kansas, Fox & Hound location.

Plaintiff's job responsibilities as a Managing Partner[14] included overseeing the operations of the Wichita Fox & Hound, compliance with applicable laws and policies, proper staffing and training, cost management, internal control oversight and compliance, guest satisfaction, sales growth, and ensuring compliance with cash handling policies and procedures.

**Plaintiff's Job Performance**

Plaintiff's immediate supervisor from October 2010 until March 20, 2012, was his District Manager, Todd Creekmur. Don Stack, Regional Vice President, oversaw operations in Plaintiff's region and was Mr. Creekmur's direct supervisor. Mr. Creekmur and Mr. Stack were primarily responsible for evaluating Plaintiff's job performance.

Some of the relevant factors in Plaintiff's job performance included self-evaluations, guest feedback, operations rankings/sales growth, attendance and staffing management, personal attitude, and cash management/internal controls.

**One-on-One Self-Evaluations**

Every twenty-eight days, General Managers complete one-on-one self-evaluations. Plaintiff's evaluations included the other managers in the store, none of whom Plaintiff had any

---

[14]Managing Partner and General Manager are used interchangeably as the job responsibilities are the same. The only significant difference between the two positions is pay and incentive structure.

involvement in hiring. The one-on-one self-evaluations contain a scale of one to five. One is considered unacceptable performance, three is satisfactory, and five is consistently exceptional performance. Fox & Hound encourages employees to be "green and growing" and honestly acknowledge that there is room for improvement.

Plaintiff acknowledged many performance issues in his one-on-one self-evaluations. Plaintiff frequently rated himself in his one-on-one evaluations as having unacceptable performance in multiple categories, including attitude, competitor activity, employee management, organization, costs, sales growth, staffing needs and turnover, guest satisfaction, and table visits.

In Plaintiff's one-on-one evaluation in December 2011, Creekmur made the following comments: "Your attitude has been great and your commitment is there as well." Plaintiff noted the following goal in his comments to that same evaluation: "GET TO TULSA !!"

**Negative Customer Feedback**

Plaintiff's performance issues included negative customer feedback at the Wichita store, poor secret shopper visits, and company-solicited feedbacks. Customer feedbacks that are submitted through corporate or through Fox & Hound's website are automatically e-mailed to a distribution list that includes appropriate District Managers and Regional Vice Presidents.

Plaintiff was aware of the negative customer feedback that the Wichita store received. Plaintiff commented on negative feedback the store received during his May 19, 2011, one-on-one self-evaluation, giving himself an unacceptable rating and stating, "we suck at shoppers."

Plaintiff continued to acknowledge the negative customer feedback resulting from

complaints on other manager's shifts on his one-on-one self-evaluations, rating his performance as unacceptable or needs improvement on August 23, 2011, September 21, 2011, October 23, 2011, December 7, 2011, and December 29, 2011.  Fox & Hound considered the negative feedback to be excessive and too much for the Wichita store.

The negative customer feedback complained specifically about Plaintiff on occasion. The Wichita Fox & Hound received public negative feedback during Plaintiff's employment via a customer review/blog post. The blog post called Fox & Hound "one of the worst customer service spots in Wichita hands down."  The blog post described an interaction with Plaintiff, conduct that Plaintiff confirmed in an e-mail to Mr. Creekmur.  After receiving poor service and asking Plaintiff for assistance, Plaintiff sent a server to follow-up with the customer.  The blog post finished describing the interaction with Plaintiff by stating, "[i]t would have been nice to see the manager show face and apologize himself but he was too busy fraternizing with the female servers."

The deteriorating customer service caused a regular customer at the Wichita Fox & Hound to log an in-person complaint at the corporate office.  In discussing the issues over a six-month time period at the Wichita location, Plaintiff's conduct was singled out, stating "it is evident, just by observation that the floor management and the managing partner are not on the same page."  The customer witnessed Plaintiff "literally walk over food on the floor without bending over and picking it up."

**Operations Rankings/Sales Growth**

Operations Rankings Reports are produced every twenty-eight days and are one measure of a store's performance during a twenty-eight day period.  All Fox & Hound store locations are

ranked on the Operations Ranking Report from one to eighty-four. A ranking of "1" indicates the store with the highest sales-based performance during that twenty-eight day period. There are numerous external circumstances that can lead a store to be ranked higher or lower on the Operations Ranking Report. The sales-based data is driven by many external factors including sporting events, special events or off-site events. External, uncontrollable factors may lead to increased sales one period, but may not result in customers returning.

A store's General Manager receives the Manager of the Period Award when the store has the highest operations ranking during the period as compared to the other stores in its specific district. There is no discretion involved in the Manager of the Period Award.

During Plaintiff's two year tenure at the Wichita store, Plaintiff's relevant district (those stores supervised by Mr. Creekmur) included five other stores. Plaintiff received the General Manager of the Period Award for Mr. Creekmur's six-store district only twice during his entire employment. During October 2011, Plaintiff received General Manager of the Period Award. During November 2011, the Wichita store received an operations ranking of seven out of eighty-four and Plaintiff received the Manager of the Period Award.

During December 2011, the Wichita store's operations ranking dropped back down to forty-one out of eighty-four. During January 2012, the Wichita store's operations ranking again dropped to fifty-seven out of eighty-four.

**Attendance and Staffing**

Plaintiff and Mr. Creekmur discussed his lack of store presence on his April 9, 2011, self-evaluation. Mr. Creekmur revised the rating on table visits to a rating of "1"—unacceptable performance and specifically noted "3 of last 4 missed." The rating was changed due to the fact

that the shoppers had not shown a table visit from a manager during the visit. These were not Plaintiff's shifts—he was rating the store, not Plaintiff personally.

On April 24, 2011, Plaintiff rated himself a "1", as not having acceptable performance on employee management staffing needs/turnover and table visits. Plaintiff gave the 1 rating due to the fact that the store was short-handed on managers and the rate of 1 means needs immediate improvement. The store was staffed with hourly employees and Plaintiff was trying to let Mr. Creekmur know that the store needed managers.

On August 23, 2011, Plaintiff rated himself as unacceptable or needing improvement on employee management staffing needs/turnover, in store management, and table visits, specifically noting, "I suck at table visits." The comment "I suck at table visits" was in jest due to the fact that Plaintiff had talked to the table, which was a "shoppers table" and identified Plaintiff as the host and that he had come by their table to check on them, but they did not check that a manager visited the table even though Plaintiff had visited with them.

September 17, 2011, Mr. Creekmur sent an e-mail to Plaintiff advising him that he needed to work more nights as he had only worked one night for the entire month. Plaintiff worked all scheduled shifts and gave all managers the days off they required. Due to short staffing on managers this was the only schedule that worked for the managers' other needs that period. On September 21, 2011, December 7, 2011, and December 29, 2011, Plaintiff again rated himself a "1" on employee management staffing needs/turnover. Manager staffing was not a store level decision.

**Personal Attitude & Behavior**

Plaintiff's negative attitude created concerns regarding his job performance. On April 9, 2011, Plaintiff rated himself as needing improvement under the attitude category of his self-evaluation. Mr. Creekmur commented that Mr. Grimes needed to "be committed to being a top contributor in the group." Plaintiff was going though a difficult time as his wife and step-daughter had moved to Tulsa to take care of Plaintiff's father-in-law, who was dying of terminal cancer. His wife's father was diagnosed with terminal cancer in January 2011. The Grimes family made the decision in February, 2011 that she would go to Tulsa to take care of him. This affected Plaintiff's work performance and attitude. On his August 23, 2011, one-on-one evaluation, Mr. Grimes stated he had a "bad attitude because life sucks."

**Cash Management/Internal Controls**

On April 27, 2011, Plaintiff received a formal Employee Counseling for violation of company policy when he failed to make timely deposits on April 27, 2011, for the third time. Plaintiff signed the formal Employee Counseling and acknowledged that "any future occurances [sic] will result in further disciplinary action, up to and including termination."

In June 2011, Mr. Creekmur discussed poor back-of-house controls and unacceptable alcohol costs with Plaintiff. Plaintiff testified at his deposition as follows:

Q. We've marked that as 30, this is a[n] e-mail from Todd Creekmur to a number of people regarding Wichita bar costs in June 23rd, 2011 and a Bud Light invoice, and then beneath that, there is a[n] e-mail from you to Todd Creekmur, is that right?
A. Correct.
Q. And you are re—you respond that you take full responsibility for your poor performance this week and you're committing to getting us back to where our store needs to be in cost?
A. Correct.
Q. So as of June 23rd, 2011, you certainly hadn't turned the store around as it relates to where the store needs to be in cost, agree?
A. No.

Q.  So is this—are you disputing the accuracy of Fox 43 and Fox 44, Exhibit 30?
A.  This was a one-week inventory, it's a snapshot in a yearlong process, year and a half.
Q.  Is it true that—well, do you agree that it's unacceptable to turn in numbers like you did last week based on those receipts?
A.  Unacceptable, no.
Q.  You think that—
A.  It was based on — it was based on the vendor that shorted us four kegs when they delivered.
Q.  There is a system for receiving the kegs, storing the kegs, and counting the product, and you did none of it, is that right?
A.  I didn't receive this order.
Q.  You were responsible to train them and make sure that all of these procedures are followed, aren't you?
A.  Sure.
Q.  And they weren't being followed in your store?
A.  They were missed on this week.[15]

Plaintiff violated company policy and the cash handling policy again on July 27, 2011. Plainitff received written discipline for his removal of $450 from the Wichita change fund for travel expenses, without prior permission, leaving an IOU as documentation.  Fox & Hound's cash handling procedure as set forth in the General Manager in Training Handbook states: "All change fund expenditures must be supported by an invoice or receipt. Change fund expenditures over $100.00 must be approved by the District Manager.  Managers are not permitted to use change funds to reimburse themselves or employees for travel expenses."  Plaintiff signed the written discipline memorandum and acknowledged that "any future situations of this nature will result in further disciplinary action, up to and including termination of employment."

Plaintiff testified in his deposition as to cash handling issues as follows:

Q.  This is an e-mail from Todd to you, he has reviewed a report, and you were short due to negative funds; and then the two days following it, you've repaid about half of it, but you were still showing a difference of about $50.  It looks like

---

[15]Doc. 43 at 113, January 29, 2013 Deposition of Don Grimes at 118:22–120:10.

we did not pay all the shortage back.  Do you remember getting this August 18th e-mail?

A.  I do now that I've read it.

Q.  Okay.  Did you ever give Mr. Creekmur an explanation for why you were having cash issues—cash handling issues as described in this e-mail?

A.  These aren't cash handling issues.

Q.  Being—having negative funds is not a cash handling issue?

A.  No.

Q.  What kind of issue would you describe it as?

A.  These were the negative deposits I spoke of earlier.  When you have negative deposits, you have to pay it back from the next night's when you do have cash.  And he's saying that we still need to pay back $50 to make—for everything to balance.

Q.  So you had—the store, at least, had violated another policy in that it didn't balance every night, and that's being described here?

A.  No, that's incorrect.

Q.  I'm handing you what's been marked Grimes 33.  This e-mail reflects another question from your district manager about missing money from a couple of Saturdays, doesn't it?

A.  Yep.

Q.  Did you say yep or nope?

A.  Yes.

Q.  Handing you Grimes 34 and asking you if this doesn't appear to be another cash handling problem with money missing from petty cash?

A.  Yes.

Q.  Okay.  Let's look at 2441.

Q.  Handing you an exhibit which has been marked Grimes 35 and asking you if this October 24th, 2011 e-mail isn't about mishandling a deposit?

A.  It's a deposit that was taken late.

Q.  But you — so you think it's appropriate to take one late, or would that be mishandling a deposit?

A.  Be mishandling.[16]

In late August 2011, Plaintiff did not have $225 in Quizbowl money for an operations meeting despite being assigned as the person physically responsible for bringing the money to the operations meeting.  In October 2011, the Wichita store had another missing deposit, again

---

[16]Doc. 43 at 114, January 29, 2013 Deposition of Don Grimes at 122:11–124:18 (marking of exhibits omitted).

violating company policy.[17]

**Plaintiff's Health Condition**

Plaintiff was diagnosed with diabetes at some point during the 1990s, but it was controlled through diet and exercise. On August 31, 2011, Plaintiff went to Immediate Care. He saw Dr. Romeo Smith and was diagnosed with a diabetic foot ulcer. During the visit with Dr. Smith, Plaintiff was given a foot cream and antibiotics. Plaintiff returned to Immediate Care on November 22, 2011, and was given more antibiotics and a referral to a podiatrist. On December 14, 2011, Plaintiff saw podiatrist Dr. Matsuda, for the first time. Dr. Matsuda completed Plaintiff's FMLA paperwork in January 2012 recommending that Plaintiff take four weeks' leave.

**Plaintiff's Request for FMLA Leave**

Plaintiff first gave notice to Fox & Hound of his need for FMLA leave on January 19, 2012, and did not request FMLA leave at any time prior to January 19, 2012. Prior to January 19, 2012, Fox & Hound's Human Resources Department was not aware that Plaintiff needed leave for health purposes or that he could not perform his job duties. Plaintiff was provided with Notice of Eligibility, Certification of Healthcare Provider, and Fitness for Duty Certification via e-mail on January 19, 2012. Dr. Matsuda completed Plaintiff's FMLA certification on January 25, 2012. On February 1, 2012, Fox & Hound received Plaintiff's Certification of Healthcare

---

[17]Plaintiff attempts to controvert this fact by stating that "this was not a missing deposit it was a negative deposit which means there was not enough cash for the day to pay cash tips." (Doc. 46 at ¶ 77). However, in his deposition testimony Plaintiff discusses a Wednesday deposit that doesn't go to the bank until Monday, with Plaintiff acknowledging that this violates company policy, and further discussing how the deposit was in the safe from Wednesday to Monday and was "overlooked" because "[t]here's all kinds of stuff that we keep in the safe. It's a small flat envelope, I mean, I—I don't have an exact answer for you." Doc. 43 at 110, January 29, 2013 Deposition of Don Grimes at 101:5–102:18. Plaintiff has failed to controvert that there was another violation of company policy.

Provider. On February 4, 2012, Fox & Hound approved Plaintiff's request for FMLA leave. Plaintiff began his four-week FMLA leave on February 20, 2012.

**Decision to Terminate**

Mr. Creekmur and Mr. Stack began discussing Plaintiff's job performance in the spring of 2011. The Manager Needs Report is an internal document produced by Fox & Hound that lists all management positions that the company considers open and is actively looking to fill. The Wichita General Manager position first appeared on Fox & Hound's internal Manager Needs Report on June 29, 2011. When Plaintiff's position appeared on the Manager Needs Report, the decision to terminate and replace Plaintiff was final and was communicated internally to District Managers, Regional Managers, Human Resources, and the Chief Operating Officer.[18] Plaintiff's position remained on the Manager Needs Report until the Wichita position was officially filled. Before a suitable candidate was found to replace Plaintiff, Fox & Hound entered into discussions to sell the Wichita store location and held off on any personnel changes that could negatively affect the potential sale.

**Plaintiff's Replacement and Termination**

After restarting the search for Plaintiff's replacement, Mr. Creekmur received Sean McLachlan's resume in November 2011. Mr. McLachlan was referred to Fox & Hound through a recruiter. Mr. McLachlan completed an official application with Fox & Hound in November 2011. Mr. McLachlan was offered the Wichita General Manager position in early December 2011. Mr. McLachlan did not want to leave his current employer without proper notice and felt

---

[18]Plaintiff's only attempt to controvert this statement is his reference to deposition testimony of Don Stack indicating that the final decision to terminate Plaintiff was made in February. This testimony was later corrected by Mr. Stack, and the Court accepts the corrected testimony as discussed later in this Memorandum and Order.

he needed to work through the holiday season.  Mr. McLachlan began work at Fox & Hound as a General Manager in Training on January 11, 2012.  Fox & Hound received the invoice, dated January 3, 2012, for the recruiter who referred Mr. McLachlan to the Wichita General Manager position.  Mr. McLachlan completed his General Manager in Training program in late March and was ready to begin working as the General Manager at the Wichita Fox & Hound.

 Mr. Stack and Mr. Creekmur placed a telephone call to Plaintiff on March 15, 2012, while he was still on FMLA leave, for the purpose of terminating Plaintiff effective March 20, 2012.  Plaintiff 's phone records show that the call terminating him took two minutes and was placed at 10:10 a.m.  At 10:13 a.m., Creekmur called Plaintiff back and according to Plaintiff repeatedly indicated that he had no idea why Fox & Hound was firing him.

Fox & Hound claimed in a letter sent the next day that it was firing him for "store management issues" that had been discussed "late last summer and fall."  The letter did not explain why Fox & Hound had waited almost eight months to do this.

Within a week of being informed of his termination, effective March 20, 2012, Plaintiff began work at Mooyah in Tulsa.  Plaintiff applied for the Mooyah job prior to taking FMLA leave.

## III.  DONALD STACK DEPOSITION CORRECTION

Plaintiff relies on Don Stack's original testimony in his deposition that the final decision to fire Plaintiff was made in February, 2012—after Plaintiff had told Fox & Hound that he had to take FMLA leave.  Stack originally testified:

Q.  Okay. Do you know when the final decision was made to terminate Don?
A.  I don't remember the specific date, no.
Q.  Do you remember the month?

14

A.  Actually believe it was in February and we didn't do it 'til March.[19]

Mr. Stack corrected this final answer to read: "We made the decision to upgrade/terminate Don Grimes in the summer of 2011."

Plaintiff argues that changing sworn testimony is regarded the same as sham affidavits to avoid summary judgment.[20]  Plaintiff cites *Burns v. Bd. of County Comm'rs*, as extending the rule regarding sham affidavits to corrections to deposition testimony.[21]  The Court in *Burns* stated that:

> Burns argues that *Franks* and other cases dealing with "sham affidavits" are not relevant to the instant case, because he modified his statements not in a subsequent affidavit, but in an errata sheet submitted pursuant to Federal Rule of Civil Procedure 30(e).  We reject this distinction.  In the recent case of *Garcia v. Pueblo Country Club*, 299 F.3d 1233 (10th Cir. 2002), this court discussed the purpose of Rule 30(e).  Quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992), we noted that "the Rule cannot be interpreted to allow one to alter what was said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard.  A deposition is not a take home examination." *Garcia*, 299 F.3d at 1242 n.5 (quotation omitted).  We stated that "we do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony."[22]

The Tenth Circuit in *Burns* held that Rule 30(e) corrections should be treated the same as

---

[19]Doc. 43, at 86, January 22, 2013 Deposition of Donald L. Stack, II, at 34:22–35:2.

[20]*See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (Courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue).

[21]*See Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275 (10th Cir. 2003).

[22]*Id.* at 1282.

affidavits and evaluated under the factors set forth in *Franks*.[23]  The factors to consider are whether Mr. Stack was cross-examined at his deposition, whether his corrections were based on any newly-discovered evidence, and whether there was confusion at his deposition that the corrections would need to clarify.[24]

Mr. Stack's Declaration addresses the corrections he made to his deposition testimony as follows:

> I made corrections to my deposition testimony based on my good faith belief and misunderstanding of the question being asked. After being asked about the timing of Mr. Grimes' termination multiple times, I believed the question, "do you know when the final decision was made to terminate Don?" was asking when Fox & Hound determined the official or effective date of Mr. Grimes' termination.  I did not believe that I was being asked when we initially decided to terminate Mr. Grimes and place him on the Manager Needs Report.  I identified the February 2012 time frame for the decision regarding Mr. Grimes' official termination date because by that time Mr. Grimes' replacement was almost finished with training and we knew when Mr. McLachlan would be ready to take over the management of the Wichita store.[25]

Looking at Mr. Stack's deposition as a whole, rather than the one corrected answer, it is clear that he misunderstood the question being asked.  Mr. Stack testified as follows:

Q.  Okay.  When was the decision made to fire Don Grimes?
A.  His performance started slipping at the beginning of the — beginning of the year.  Todd and I had—
Q.  Beginning of what year, I'm sorry?
A.  2011, or in — about like April 2011.  That's — that's a guess.  But it was beginning of 2011 when we — we started having conversations about Don Grime's performance.  And Todd kept me up to date with what was going on, and that's — that's when the events led to us deciding to look for Don's replacement.

---

[23]*Id.*; *see also* Fed. R. Civ. P. 30(e).

[24]*Franks*, 796 F.2d at 1237; *Burns*, 330 F.3d at 1282.

[25]Doc. 53-10, at 1–2, Declaration of Donald Stack.

Q. So back to my question. When was the decision made to replace Don?

       Ms. Lemley: Objection.

Q. When would that have been?

       Ms. Lemley: Asked and answered.

A. I—I—we started making the decision—or started having conversations in—at the beginning of 2011 or first part of 2011 because of performance in the unit or things that was happening with Don and it led to us looking for his replacement.

Q. Okay. So you started having conversations in the first part. Was that like January?

A. April.

Q. Okay.

A. Is what I remember.

Q. So in April you started talking about replacing him?

A. Around April, yes.

Q. When was the decision finally made to replace him?

A. I don't remember the exact date, but it had to do with finding his replacement.

Q. Okay. So you know that it's — the discussion started in April and you don't — you can't help us when the decision was actually made.

A. I know— I know that we started talking about his performance because of some issues that happened in the store.

Q. Okay. So back to my question. You know that you started talking about a replacement in April but you don't know when the decision was finally made to replace him?

A. The specific date, no.

Q. Or an estimate of the date.

A. The— the date moved a little bit because of circumstances, not finding his replacement and some situations that happened in the store.

Q. Okay. When it moved, when did you think you were going to replace him?

A. It would have happened if we'd had a candidate earlier. We didn't have a candidate.

Q. When did you — you say it moved. When did you initially plan to replace him?

A. We didn't have a specific date. It depended on finding a replacement.[26]

Clearly there was confusion as to whether the reference was to the timing of the decision to terminate Plaintiff as opposed to the timing of the actual termination. The Court finds that in considering the factors set forth in *Franks*, Mr. Stack's corrected testimony should not be disregarded.

---

[26]Doc. 43, at 83–84, January 22, 2013 Deposition of Donald L. Stack, II, at 17:6–19:14.

## IV.    DISCUSSION

The Tenth Circuit recognizes two theories of recovery under 29 U.S.C. § 2915(a): "an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)."[27]  Although the parties' arguments overlap and apply to both claims, because the elements and burdens of proof differ between the two claims, the Court will analyze the claims separately.[28]

### A.    FMLA INTERFERENCE

Plaintiff claims that Fox & Hound unlawfully interfered with his FMLA rights by terminating him while he was on FMLA-protected leave.  Under the FMLA, a qualified employee may take up to twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[29]  Under 29 U.S.C. § 2615(a)(1), it is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" this substantive right.[30]  Courts have recognized this provision as giving rise to an interference or entitlement theory of recovery.[31]

To prevail on an FMLA interference claim, Plaintiff "must show that [he] was entitled to FMLA leave and that some action by the employer, such as termination, interfered with [his]

---

[27]*Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1170 (10th Cir. 2006) (citation omitted).

[28]*Id.*

[29]*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1006 (10th Cir. 2011) (citing 29 U.S.C. § 2612(a)(1)(D)).

[30]*Id.*

[31]*Id.* (citations omitted).

right to take that leave."[32]  To establish an FMLA interference claim, plaintiff bears the burden

of demonstrating: (1) that he was entitled to FMLA leave; (2) that some adverse action was taken

by the defendant that interfered with his right to take FMLA leave; and (3) the defendant's action

was related to the exercise or attempted exercise of plaintiff's FMLA rights.[33]  "A deprivation of

these rights is a violation regardless of the employer's intent, and the *McDonnell Douglas*

burden shifting analysis does not apply."[34]

Plaintiff points to the timing of his termination, arguing that it shows that the termination

relates to his exercise of FMLA rights.  Plaintiff is correct that "timing can be particularly

suggestive in determining whether termination relates to the exercise of FMLA rights."[35]

However, in order to make his timing argument, Plaintiff must controvert Fox & Hound's

evidence that it decided to terminate Plaintiff in the summer of 2011, before it learned of his

FMLA request.[36]  Fox & Hound has shown that it decided to terminate Plaintiff well in advance

of any knowledge of his possible entitlement to FMLA leave.

However, despite Plaintiff's argument regarding the timing of Fox & Hound's decision,

§ 2615(a)(1) is ""not a strict liability statute," and an employer is not necessarily liable under the

FMLA anytime it fires an employee who has requested or is on FMLA leave."[37]  An employee

---

[32]*Id.* (citations omitted).

[33]*Metzler,* 464 F.3d at 1180.

[34]*Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226–27 (10th Cir. 2012) (citing *Metzler*, 464 F.3d at 1180).

[35]*Id.* at 1227.

[36]The Court will further address Plaintiff's timing argument in the analysis of pretext under Plaintiff's retaliation claim.

[37]*Twigg*, 659 F.3d at 1006 (citing *Metzler*, 464 F.3d at 1180).

may be terminated even if the termination interferes with the requested FMLA leave as long as the employee would have been terminated regardless of the request for leave.[38]  The defendant-employer has the burden of demonstrating that "an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave."[39]  The Tenth Circuit has stated that:

> Rather, because "an employee who requests leave or is on leave
> has no greater rights than an employee who remains at work[,] . . .
> an employee may be dismissed, preventing her from exercising her
> statutory right to FMLA leave[,] . . . if the dismissal would have
> occurred regardless of the employee's request for or taking of
> FMLA leave.[40]

In this case, Fox & Hound has carried its burden of proving that Plaintiff was dismissed for a reason sufficiently unrelated to his FMLA leave, and that Plaintiff would have been terminated regardless of his request for FMLA leave.  "For an employer to demonstrate that it would have terminated the employee anyway, it must provide evidence of alternative reasons for termination."[41]  Even viewing the record in the light most favorable to Plaintiff, Fox & Hound has made a showing that the evidence is so one-sided that submission to a jury is not required.

There is overwhelming, uncontroverted evidence that Fox & Hound terminated Plaintiff

---

[38]*See Brown*, 700 F.3d 1222.

[39]*Metzler*, 464 F.3d at 1180 (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963) (10th Cir. 2002)); *see also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

[40]*Twigg*, 659 F.3d at 1006 (citing *Smith*, 298 F.3d at 960–61 (internal quotation marks omitted); *see also Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) ("If dismissal would have occurred regardless of the request for an FMLA leave, . . . an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave."); *Gennell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998 ) ("[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request.").

[41]*Brown*, 700 F.3d at 1227.

for poor performance and its dissatisfaction with Plaintiff. Fox & Hound's management identified and detailed specific performance issues, including negative self-evaluations, negative feedback, cash handling issues and poor attitude. Plaintiff has not put forth evidence to contradict Fox & Hound's assertion that Plaintiff was scheduled to be fired for reasons entirely unrelated to his FMLA leave. Although Plaintiff has responded to the specific performance issues identified by Fox & Hound, Plaintiff has merely given his justifications for his actions, he has not controverted that management identified and detailed specific performance issues.[42] Plaintiff points to an email he received from Creekmur referring to Plaintiff as a "pussy" in response to Plaintiff's text to Creekmur of a picture of Plaintiff wearing a boot on his lower leg and foot, claiming that this evidence is highly indicative of interference. Plaintiff claims that although Creekmur claims he was only kidding, and although Plaintiff testified that there was a bit of jest and a bit of seriousness in the comment, Plaintiff claims that this somehow creates an issue for the jury. The Court disagrees that this single, arguably joking exchange that occurred more than a month before Plaintiff requested FMLA leave creates a genuine dispute as to a material fact.

The Court is not "here to judge the wisdom of management's responses, but rather only to determine whether [defendant] has come forward with evidence suggesting it would have terminated [plaintiff] regardless of his FMLA activities."[43] There is overwhelming, uncontroverted evidence that Fox & Hound terminated Plaintiff for poor performance unrelated to his exercise of his FMLA rights. Viewing the record in the light most favorable to Plaintiff,

---

[42]Plaintiff's responses are further addressed below in the Court's pretext analysis.

[43]*Brown*, 700 F.3d at 1228.

the Court finds that there is no genuine dispute as to any material fact regarding the grounds for termination and the evidence is so one-sided that submission to a jury is not required.

## B.     FMLA RETALIATION

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."[44] This provision of the FMLA is construed as creating a retaliation theory of recovery.[45]

Plaintiff's retaliation claim under the FMLA is subject to the *McDonnell Douglas*[46] burden-shifting analysis.[47]   Under this analysis, plaintiff bears the initial burden of establishing a prima facie case of FMLA retaliation.  In order to do so, plaintiff must demonstrate that: (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the two actions.[48]

Fox & Hound relies on the timing of its decision to terminate Plaintiff to argue that Plaintiff cannot show a causal connection as required for Plaintiff's prima facie case.  Fox & Hound argues that regardless of the temporal proximity between the FMLA leave and termination, there can be no causal relationship if the decision to terminate was made before the decision-maker had knowledge of the employee's possible entitlement to FMLA leave.  The Court agrees that Plaintiff's attempt to controvert Fox & Hound's evidence regarding the timing of its decision is lacking.  However, even if the Court were to assume that Plaintiff has met his

---

[44]*Twigg*, 659 F.3d at 1004 (citing 29 U.S.C. § 2615(a)(2)).

[45]*Id.* (citations omitted).

[46]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

[47]*Metzler*, 464 F.3d at 1170 (citations omitted).

[48]*Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 886 (D. Kan. 2007).

initial burden of establishing a prima facie case of retaliation, he has failed to prove that Fox & Hound's proffered rationale for terminating him was pretextual.

Once plaintiff establishes a prima facie case of FMLA retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Once the defendant has satisfied this burden of production, the burden shifts back to the plaintiff to present evidence that the defendant's proffered reason is pretextual.[49]

Fox & Hound has met its burden of articulating a legitimate, non-retaliatory reason for the adverse employment action. It alleges that Plaintiff was terminated for poor performance and has set forth several instances of Plaintiff's poor performance.

Because Fox & Hound has offered a legitimate, non-retaliatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to present evidence that Fox & Hound's proffered reason is pretext for unlawful retaliation. Pretext can be shown by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons."[50] Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.[51]

Plaintiff argues that the temporal proximity between his FMLA request and his actual termination shows pretext. Plaintiff sets forth several arguments attempting to show that Fox &

---

[49] *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323–25 (10th Cir. 1997).

[50] *Id.* at 1323 (citations omitted).

[51] *Temple v. Auto Banc of Kan., Inc.*, 76 F. Supp. 2d 1124, 1132 (D. Kan. 1999) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted)).

Hound's allegation regarding the timing of its decision to terminate Plaintiff is unworthy of belief.[52] Plaintiff argues that Fox & Hound's timing is contrary to the sworn deposition testimony of the individual who terminated him. The Court has already addressed this issue and found that the corrected testimony of Mr. Stack should not be disregarded.

Plaintiff also argues that there is nothing in Plaintiff's personnel file supporting this alleged earlier decision to terminate him. Plaintiff claims that the lack of documentation in his personnel file to show that Fox & Hound decided to terminate him in the summer of 2011 is circumstantial evidence that this tale has been manufactured. The Court finds this argument unpersuasive. A lack of documentation in the personnel file would be consistent with Fox & Hound's decision not to notify Plaintiff of the termination until his replacement was secured.

Plaintiff also makes an argument that the time period between Fox and Hound's alleged termination decision and the actual termination shows it is not credible. To support this argument, Plaintiff cites an unpublished opinion from the Western District of Michigan to show that a delay in discharging the plaintiff can be evidence of pretext.[53] The Court finds this argument unpersuasive. The case cited by Plaintiff found that "a reasonable jury could infer from Defendant's *unexplained* delay in terminating Plaintiff that Defendant used the three-day rule to deny Plaintiff FMLA leave."[54] Fox & Hound has explained its delay and Plaintiff has not come forth with any evidence showing that Fox & Hound's explanation for the delay was

---

[52]The Court notes that paragraph 33 of Plaintiff's affidavit refers to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 46), and lists out the numerous responses to Fox & Hound's statements of uncontroverted fact and states that those responses are Plaintiff's "based upon [his] personal knowledge and observation." No specific facts or incidents are set forth in paragraph 33 and many of the assertions that paragraph 33 allegedly supports are not within Plaintiff's personal knowledge.

[53]*See Bradford v. Challenge Mfg. Co.*, No. 1:08-CV-798, 2010 WL 1758243 (W.D. Mich. April 30, 2010).

[54]*Id.* at *2 (emphasis added).

unworthy of belief. Fox & Hound has shown that the delay resulted from a possible sale of the store and Fox & Hound's delay in securing Plaintiff's replacement.

Fox & Hound presented evidence that Plaintiff's performance began to decline in the beginning of 2011, Mr. Stack and Mr. Creekmur discussed Plaintiff's poor performance, and Plaintiff's continuing poor performance led Fox & Hound to begin searching for Plaintiff's replacement. Fox & Hound presented evidence that the decision to terminate Plaintiff was made during the summer when his position was placed on the Manager Needs Report, but his actual termination was postponed due to a potential sale of the store and difficulties securing his replacement.

Plaintiff attempts to discredit Fox & Hound's reliance on its listing of the Wichita store on the Manager Needs Report, arguing that this listing is based on Fox & Hound's promise to transfer him to Tulsa, rather than in anticipation of terminating him. Plaintiff claims that at the end of March or the beginning of April, 2011, he sent emails to Creekmur indicating his desire to transfer to Tulsa, and that Creekmur replied via email that Plaintiff would get the Tulsa store. Plaintiff claims the plan was to transfer the General Manager from Albuquerque to Wichita, and although the transfer was originally planned for June 2011, the plans were delayed because the Albuquerque location lost a couple of managers and the General Manager was terminated. Plaintiff claims that every month he would speak to Mr. Creekmur about the transfer and the timing of it, and that the Tulsa store started losing managers so it put them in a bind and pushed back the General Manager's termination at that store. Plaintiff moved to Oklahoma while he was the General Manager of the Wichita store. Mr. Creekmur admits that at one point it absolutely "might" have been a possibility for Plaintiff to move to Tulsa and that he understood

that moving to Tulsa was Plaintiff's goal.

Plaintiff has failed to present evidence that Fox & Hound's explanation is pretext. Plaintiff has only offered his belief that his job was listed on the Manager Needs Report because he was being transferred to Tulsa. Plaintiff has presented no documentation showing that Fox & Hound was in fact transferring him to Tulsa. Plaintiff testified that he was not privy to the Manager Needs Report. Creekmur testified that there is a spreadsheet called "Relocatable General Managers" listing General Managers that are relocatable to a different area of the country. There is no evidence that Plaintiff was ever listed as a relocatable candidate.

The timing of Plaintiff's termination had nothing to do with Plaintiff's FMLA request, but was a management decision based on the timing and readiness of Plaintiff's replacement, Mr. McLachlan. In *Sabourin v. Univ. of Utah*, the court dismissed the plaintiff's assertions that the delay in providing the official notice of termination indicated the decision was not final, noting that bureaucratic causes delayed the process and that plaintiff failed to provide any evidence of hesitation or reconsideration.[55] Plaintiff has likewise failed to present evidence that Fox & Hound's decision was not final prior to his FMLA request.[56]

Plaintiff's remaining attempts to show pretext focus on his opinion of how he turned the Wichita store around and his explanations for his poor performance ratings, negative feedback and disciplinary write-ups.

Plaintiff argues that the Wichita store was in bad shape when he took it over, having no

---

[55]*See Sabourin v. Univ. of Utah*, 676 F.3d 950, 959 (10th Cir. 2012).

[56]*See Taylor v. Smith's Food & Drug Ctrs., Inc.*, 127 Fed. App'x. 394, 397 (10th Cir. 2005) (employer's decision was unrelated to plaintiff's FMLA request because it would have terminated plaintiff anyway; it "had already *begun* to process [plaintiff]'s termination two days prior to her request for the FMLA forms.") (emphasis added).

managers because they had fired three and one quit, the store was ranked low, and it had the worst guest feedback because it was "right next to corporate." Plaintiff then argues that he turned the Wichita store around. Plaintiff points to instances where management acknowledged his good performance by asking him to train others and assist other General Managers, and a July 9, 2011 text from Creekmur to Plaintiff stating "Stellar visit yesterday— thanks. You got the best store nod from the big guy. Says it was his best visit there that he ever can remember. Thanks for the hard work." Plaintiff then points to his receipt of General Manager of the Period twice in the fall of 2011, and an October 13, 2011 text from Creekmur to Plaintiff saying "Hell just froze over? You won the period sir." Fox & Hound does not dispute that Creekmur acknowledged Plaintiff's periods of improvement as part of his supervisory duties. Fox & Hound states that both the October 2011 and November 2011 Operations Rankings/General Manager of the Period Awards occurred after the decision had already been made to terminate Plaintiff, and that Fox & Hound did not consider the October-November rankings sustained or consistent performance for the Wichita store.

Plaintiff's opinion regarding his turn-around of the Wichita store is insufficient evidence of pretext. Fox & Hound does not dispute that brief periods of good performance occurred, but some positive performance cannot overcome Fox & Hound's performance concerns in other areas. In *Brown v. Scriptpro, LLC*, the Court held that "the inclusion of positive comments does not change the fact that [the employer] expressed significant concerns regarding various other categories of performance," and that the plaintiff's "own evaluation of his performance is not

enough to give rise to a material factual dispute."[57]

Plaintiff does not deny that he was given a written reprimand for taking an advance for employee travel costs.  Plaintiff argues that with regard to his removal of $450 in petty cash from the safe, he had no idea that this was improper as it was for a company trip, the money was accounted for, and all receipts were returned and the safe balanced when he returned the receipts. Plaintiff claims that Creekmur specifically told Plaintiff to do the very same thing for a visiting manager from Tulsa who needed cash.  However, Plaintiff's use of the funds was done without prior approval and Plaintiff does not dispute that he signed the written discipline memorandum and acknowledged that "any future situations of this nature will result in further disciplinary action, up to and including termination."  Plaintiff has merely offered an after-the-fact justification for his actions.

In response to the cash handling issues, Plaintiff argues that there were many days that there was simply no cash to deposit because of the high percentage of credit card usage and the fact that cash tips were paid out nightly.  There were days in a row when there was no cash to deposit.  The Court previously noted that at least on one occasion the deposit was supposedly in the safe and was just "overlooked" and Plaintiff testified that taking deposits late constituted "mishandling."

Plaintiff also alleges that the allegations regarding alcohol costs were caused by a vendor who shorted the store four kegs when they made a delivery on one of the other manager's shifts. However, Plaintiff acknowledged that there was a system for receiving the kegs, storing the kegs

---

[57]*Brown*, 700 F.3d at 1229 (citation omitted); *See also Campbell v. Gambro Healthcare, Inc.*, 447 F. Supp. 2d 1205, 1224 (D. Kan. 2006), *aff'd* 478 F.3d 1282 (10th Cir. 2007) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." ).

and counting the product, and although Plaintiff did not receive this particular order he was responsible to train the other employees and make sure that these procedures were followed.

Plaintiff claims that the negative feedback was actually greatly improved under his leadership, and that various complaints were on other manager's shifts. He further claims that the negative customer feedback rarely complained specifically about him, and he could only remember feedback specifically naming him once or twice. Plaintiff also alleges that all stores receive negative feedback, and points to negative feedback received at another store location that he claims "dwarfed the plaintiff's store." Plaintiff asserts that he was told by "Natalie at corporate" in the late spring of 2011 that the Wichita store's negative feedback had been cut by more than 70% since he had taken over. Plaintiff then claims that Natalie was the employee at the corporate office who received and closed out all of the complaints for the entire company. However, Plaintiff relies on inadmissible hearsay of a Fox & Hound employee who was not deposed, nor identified as a potential witness. In fact, Fox & Hound has presented Natalie Cook's declaration, showing that her job responsibilities do not include reading the content of all customer feedback, performing any analytical analysis, or creating any data-based breakdown of the feedback into positive or negative categories.[58] She states that she does not "recall saying that Mr. Grimes reduced the negative feedback the Wichita Fox & Hound store received by 70 % as [she does] not calculate any analytical statistics or provide any data-based breakdowns of the feedback."[59] Fox & Hound presented evidence that there was not any substantial improvement in negative feedback as there were thirty-eight instances in 2009, forty-five instances in 2010,

---

[58]Doc. 53–5.

[59]*Id.* at ¶ 4.

forty-three instances in 2011, and forty-seven instances in 2012.

In response to his negative self-evaluations, Plaintiff points to the fact that his evaluations included the other three managers in the store—none of whom he had any involvement in hiring— and that he believed that he should be his own toughest critic. Plaintiff also claims that although there were other managers who gave themselves extremely high marks, Plaintiff simply refused to do this, because the "whole philosophy" was to manage yourself and Plaintiff believed that he was taking the right approach to the evaluations even though he could have given himself much higher numbers.

It is undisputed that Plaintiff was documented for violations of company policy and that the policy itself is undisputed. Plaintiff's after-the-fact explanations and attempts to blame feedback, evaluations and receipt of orders on other managers under his supervision is insufficient. Plaintiff retained ultimate management responsibility for all aspects of the Wichita Fox & Hound restaurant, including training and ensuring proper procedures were followed; therefore, all performance issues were ultimately Plaintiff's responsibility and all negative feedback reflected on him as General Manager. Plaintiff has failed to show that Fox & Hound's alleged reason for terminating Plaintiff—his poor performance—is pretextual. It is not the "court's province to decide whether that decision was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [decision]."[60] In demonstrating pretext, the Court does not second-guess an employer's business judgment or decisions, but questions whether the defendant honestly believed those reasons.[61]

---

[60]*Antle v. Blue Cross & Blue Shield of Kan., Inc.*, 75 F. Supp. 2d 1248, 1259 (D. Kan. 1999).

[61]*Riggs v. AirTran Airways*, 497 F.3d 1108, 1119 (10th Cir. 2007).

Finally, because the Court is granting summary judgment in favor of Fox & Hound on Plaintiff's FMLA claims, the Court need not address the parties' arguments regarding liquidated damages and front pay under the FMLA.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Hearing (Doc. 49) is **DENIED**.

**IT IS FURTHER ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 42) is **GRANTED**.

**IT IS SO ORDERED.**

Dated: November 25, 2013

S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE